UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2006 APR 11  A 9: 34

U.S. DISTRICT COU
DISTRICT OF MASS.

DAVID A. SHRAIR and ANNE )
POLEP, Trustees of the Mortimer )
Polep Irrevocable Trust, )
    Plaintiffs )
 )
v. ) CIVIL ACTION NO. 05-30041-MAP
 )
REASSURE AMERICA LIFE )
INSURANCE COMPANY, )
    Defendant )
 )

### DEFENDANT REASSURE AMERICA LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is an action in which plaintiffs David A. Shrair and Anne Polep, Trustees of the Mortimer Polep Irrevocable Trust ("Plaintiffs"), seek declaratory and injunctive relief with respect to a life insurance policy issued by Maccabees Mutual Life Insurance Company and now known as defendant Reassure America Life Insurance Company ("Reassure"). The Plaintiffs are the owners and beneficiaries of the policy and the insured is Mortimer A. Polep.[1] The policy insuring Mr. Polep lapsed in November 2004 due to Plaintiffs' failure to pay the necessary premiums to maintain the policy. Plaintiffs contend, however, that they were not given proper notice that the policy was about to lapse, that they were prepared to pay the required premium when it became due, and that the policy's lapse is therefore null and void. After the lapse of the policy, Plaintiffs applied for reinstatement, which required evidence of insurability, but their

---

[1] When this action was commenced, Mr. Polep was still living, but he has recently passed away.

{K0323082.1}

application was denied due to Mr. Polep's health history. Plaintiffs filed this suit thereafter, alleging that despite their actual knowledge of the policy's pending lapse, and despite Reassure's production of copies of the notice sent to Plaintiffs warning that the policy would terminate unless premium was submitted, they did not have sufficient notice of the lapse and therefore this court should intervene.

## STATEMENT OF UNDISPUTED FACTS

Reassure incorporates herein by reference the Statement Of Undisputed Facts, prepared in accordance with Fed. R. Civ. P. 56 and Local Rule 56.1, and set forth in its motion for summary judgment. Factual references in the following argument shall be to the underlying sources contained in the Appendix.

## ARGUMENT

**1.     The Policy Lapsed for Failure to Pay the Required Premium**

It is undisputed that the policy insuring Mortimer Polep ("the Policy") lapsed for failure to pay premium in September, 2004 when the policy's accumulation value became negative. Plaintiffs do not contend that they remitted the required premium and it was somehow lost in the mail, or that the Policy had sufficient accumulation value to pay the cost of insurance and expenses due in September 2004. Quite to the contrary, they had actual knowledge that a premium was due in September, 2004 and they failed to pay it. They also had actual knowledge that the Policy had absolutely no accumulation value sufficient to deduct September 2004's cost of insurance and expenses from. Their sole contention in this case is that they should be excused from their failure to pay the required premium that resulted in the Policy's lapse because they did not receive a notice advising them that the Policy was about to lapse. They make this contention even though they had actual knowledge that the lapse was about to occur. Plaintiffs overlook the fact that under well-established Massachusetts precedents, they have an affirmative duty to pay premiums as they become due. *Sherman v. Metropolitan Life Ins. Co.*, 297 Mass. 330, 334, 8 N.E.2d 892 (1937). *Rocci v.*

*Massachusetts Accident Co.*, 222 Mass. 336, 342, 110 N.E. 972 (1916). "Prompt payment [of premiums] and regular interest constitute the life and soul of the life insurance business." *Thompson v. Knickerbocker Life Ins. Co.*, 104 U.S. 252, 258 (1881). *Sherman v. Metropolitan Life Ins. Co., supra.*

2.  **Under the terms of the Policy, Reassure Was Not Required to Give Notice to the Plaintiffs That a Premium Was Due or That a Monthly Charge Was Due.**

The policy issued on Mortimer Polep's life is a "Flexible Premium Adjustable Life Insurance Policy" with "Flexible Premium Payments." Flexible premium policies, also commonly referred to as universal life policies, have unique terminology with respect to how the policy is paid for and what event brings about a lapse of the policy. As explained by James Aronson and J. Rockwell Allen, two experienced insurance agents who provided advice to Mr. Shrair and Mr. Polep in July and August, 2004 when a premium payment is needed to maintain the Policy's cash value, the Policy allows the annual premium to be adjusted to satisfy the cost of insurance and expense charges. Aronson Dep. at 20-21; Allen Dep. at 17-19. The "Initial Premium" payable on the Policy when it was issued in 1985 was $23,213.00, which also was the annual "Planned Periodic Premium Payment" requested by the Plaintiffs (via the former policy owners) in the application for the Policy. Shrair Dep. – Ex. 3. p. 021, Quest. 6a; Ex. 3A. Unlike standard whole life insurance policies or term life insurance, premiums payable on universal life policies are "flexible" and don't have to be paid according to any pre-set schedule. As stated in the Policy, "[c]hanges in frequency and increases or decreases in the amount of Planned Periodic Premium payments may be made by the Owner." Shrair Dep. – Ex. 3, p. 008-"Payment." Reminder notices that a Planned Periodic Premium is due are sent to the owner of the policy, but only upon written request, and only to remind policy owners that they may want to submit a payment to maintain their policy's accumulation value. Shrair Dep. – Ex. 3, p. 008-"Payment." Failure to pay a Planned Periodic Premium is not, under the terms of the Policy, the event that triggers a lapse of the policy. As more fully discussed below, it is the failure of the Accumulation Account of the policy to have sufficient

funds to pay the Monthly Expense Charge that causes the policy to terminate. Shrair Dep. – Ex. 3, p. 009-"Insufficient Accumulation Value."

Under the terms of Mortimer Polep's policy, all monies paid and credited to the policy are deposited into an Accumulation Account, which is referred to in the policy as the "Accumulation Value." Shrair Dep. – Ex. 3, p. 004-"Accumulation Value" and p. 009-"Accumulation Value." Each month, on the "Monthly Deduction Day," which for the Policy was the 17th of each month, a "Monthly Expense Charge" is deducted from the Accumulation Account. Shrair Dep. – Ex. 3, p. 004-Definitions; Ex. 3A. The Monthly Expense Charge is the total amount deducted each month to pay for the coverage provided under the Policy. Shrair Dep. – Ex. 3, p. 004. The Monthly Expense Charge consists of two parts: 1) the Cost of Insurance, and 2) an Administrative Charge, which for the Policy was $5.00. Shrair Dep. – Ex. 3, p. 009; Ex. 3A. The Cost of Insurance for the Policy was calculated on a monthly basis in accordance with a formula set forth in the Policy. Shrair Dep. – Ex. 3, p. 009.

If the Accumulation Account, on the day immediately preceding the Monthly Deduction Day, is not sufficient to cover the Monthly Expense Charge for the next month, the policy will terminate, subject to the Grace Period provision. Shrair Dep. – Ex. 3, p. 009-"Insufficient Accumulation Value." The Grace Period provision of the Policy allows a grace period of 61 days for the payment of a premium sufficient to cover the Monthly Expense Charge. Shrair Dep. – Ex. 3, p. 008-"Grace Period." Written notice that such a premium is due will be mailed at least 30 days before the date on which coverage would end to the last known address of the owner of the of the policy. *Id.* Under the terms of Mortimer Polep's policy, this written notice is the only form of notice that Reassure was obligated to send concerning the need for premiums to be paid. It is this form of notice from Reassure that Mr. Shrair claims he did not receive in October, 2004, but which Reassure's records show was in fact sent. Reassure's records also show, and Mr. Shrair's records confirm this, that annual

reports setting forth information about the current status of the Policy and the amount of annual premium payments, were transmitted by Reassure and in fact received by Mr. Shrair. *See,* Shrair Dep.– Exs. 4I, 4J, 4K, 4M, 4N, 7, 8, 9, 11; Cowens Dep. at 46, 53, 63; Ex. 17. However, although Mr. Shrair had several copies of these annual statements in his file, he had no idea where these statements had come from; that is- he had no idea whether Reassure had sent them to him or whether Mr. Shrair or some other person had sent them to him. Shrair Dep. at 40-42, 66-69.

Mortimer Polep did not pay the Planned Periodic Premium on a regular, annual basis. By 1993, after the Policy had been in force for eight years, Mr. Polep had built up a sufficiently large Accumulation Value and he did not have to pay any premiums for 7 years, from 1993 to 1999. Cowens Dep. – Ex. 15. In June, 1993, Mr. Polep requested, through his agent Hillard Aronson, that all annual periodic premiums in the amount of $23,213.00 from 1993 through 1999 be paid from the accumulation value of the Policy. Cowens Dep. at 32-40; Ex. 15. Although the policy automatically would have paid the cost of insurance and expenses (what Mr. Polep and Mr. Aronson referred to as the "premiums") from the accumulation value without any request, upon receipt of this request, a billing "suspense code" was placed on the Policy, so that annual Planned Periodic Premium reminder notices would no longer be generated and transmitted to the policyowner. Cowens Dep. at 37-39. At no time after 1993 did either Mr. Polep or Mr. Shrair make any written request that annual planned periodic premium notices be resumed. Cowens Dep. at 67-71. Despite the absence of any such written request, Mr. Shrair apparently received a "Payment Notice" dated June 17, 2002 for a 12-month premium in the amount of $23,213.00.[2] Shrair Dep. – Ex. 4D; Cowens Dep. – Ex. 20. After researching the issue of why an annual premium notice would have been sent at this time in light of the fact that such notices were suspended, Ms. Cowens reported that the

---

[2] Reassure produced file copies of annual "Payment Due Notices" from 1997 and 1999 which had been sent to Mr. Shrair by Royal Maccabees. Cowens Dep. – Ex. 22. As these notices pre-dated Reassure's administration of the Policy, Ms. Cowens could not speak to the issue of why these notices were transmitted in light of the suspend code. Cowens Dep. at 83-85.

{K0323082.1}                                              5

billing had not been generated automatically, but rather was likely the result of an oral request from the policyowner. Cowens Dep. at 42-43 and Follow-up Statement, 1/06/06. In any event, in a letter dated June 5, 2002, Mr. Shrair re-affirmed that Mr. Polep wished to continue having the annual premiums of $23,213.00 withdrawn from the cash value of the Policy. Shrair Dep. – Ex. 4A; Cowens Dep. – Ex. 20. As such, additional planned periodic premium reminder notices were again suspended. Thus, in the absence of a written request that premium payment reminder notices be reinstated, no such notices were required and none were given.

3.   **Reassure's Business Practices with Respect to Notices and Mailings**

Barbara Cowens, Vice President of Reassure's Policyowner Services and a 27 year vetran of various positions within the company, testified at her deposition as Reassure's representative that Reassure sent Plaintiffs notice of the policy's pending lapse on DATE??? in accordance with its usual and customary business practices. Cowens Dep. at 9-10; Ex. 14. At the time of her deposition, Ms. Cowens was responsible for overseeing the company's customer service department and administrative services department. Cowens Dep. at 7-8. Ms. Cowens testified at length concerning Reassure's usual and customary business practices concerning the mailing of notices and statements with respect to its policies during the period on and after September, 1999. Cowens Dep. at 22-23. As the result of a merger in September 1999, Reassure became the insurer on all of Maccabees' life insurance policies. As a result, in September 1999, Reassure assumed responsibility for the administration of the Maccabees policies, including the Mortimer Polep policy. Cowens Dep. at 23.

As Ms. Cowens testified, it has been Reassure's usual and customary business practice to send all notices and statements by regular, first class mail to the policy owners' address of record for each policy. Cowens Dep. at 22-24. Ms. Cowens identified and distinguished the different notices that are sent, and when they are sent. She identified three particular types of notices that are sent to a policy owner in connection with premium due under this type of policy: planned periodic premium payment notices, lapse notices (also known as "payment due

notices") and termination notices. Cowens Dep. at 23-24. All these notices are programmed into Reassure's computer system and are generated automatically. Cowens Dep. at 27. Individual information about all policies, such as their issue date, accumulation value, monthly deductions (cost of insurance and expense loads), planned periodic premium notice reminder dates, and the policy owner(s) names and addresses where notices are to be sent, is also programmed into the computer system. Cowens Dep. at 27-29. When Reassure took over the administration of the former Maccabees policies in September, 1999, all of the policy data from the Maccabees data base, involving some 300,000 policies, was transferred to Reassure's computer system. Cowens Dep. at 29, 38, 73, 87. With respect to the Mortimer Polep policy, all notices generated were sent to David Shrair, Trustee, 1380 Main Street, Springfield, Massachusetts 01103. Cowens Dep. at 22, 52, 65-66, 73, 95, 97-98, 100, 107, 110; Exs. 26-28. *See also,* Shrair Exs. 4D, 4E, 4F, 4I, 4J, 4K, 4M, 4N, 4O.

Ms. Cowens testified that the actual performance of administrative services with respect to the Maccabees/Reassure policies is done by a third-party vendor. From 1999 to 2003, these administrative services were performed by a company called Cybertek Corporation. Cowens Dep. at 75-76. In 2003, Cybertek was acquired by CSC Corporation, which continued performing the same administrative services with the same employees. Cowens Dep. at 76-77. The Maccabees/Reassure policy data base has been provided to both Cybertek and CSC and is used in the administration of Reassure's policies. Cowens Dep. at 78. Cybertek and CSC provide complete policy administration, including generating and mailing planned periodic premium notices, lapse notices and termination notices, collecting policy premiums and paying claims for benefits. Cowens Dep. at 75.

On a monthly basis, Reassure conducts a review process of the services performed by CSC. Cowens Dep. at 78. Included in this review is a determination as to whether notices have been properly transmitted. *Id.* Reassure has put procedural safeguards in place to insure that notices on policies are properly transmitted. *Id.* at 79. These safeguards consist of a review process, which Ms. Cowens described as follows:

> Payment notices are generated on the [computer] system, they are received into the accounting area, [where] the count is verified that the number of notices that were supposed to generate actually generated on the system, they are then taken to the mail center, the mail center meters those notices and then they are provided to our pre-sort vendor to mail the notices.

Cowens Dep. at 80. All of these notices are actually placed in the mail by the pre-sort vendor, National Presort, which carries out this function under the direction of CSC. Cowens Dep. at 80-81. Reassure has no knowledge of any particularized complaints made relative to National Presort's activities from the time that Reassure took over administration of the Maccabees' policies in September, 1999. *Id.*

### 4. Reassure Mailed, and Mr. Shrair and Mr. Polep Received, Written Notice in June, 2004 That the Policy Would Terminate in July, 2004.

Ms. Cowens testified that on or about June 17, 2004, Reassure mailed a notice to David Shrair and Anne Polep, Trustees, at the address shown on the notice – 1380 Main Street, Springfield, MA 01103. Cowens Dep. at 93-95, 99-100; Ex. 26. The envelope in which the notice was sent is a double window envelope which had Mr. Shrair at 1380 Main Street, Springfield, Massachusetts 01103 as the addressee, and Reassure America in Dallas, Texas as the return address. Cowens. Dep. at 94-95; Ex. 26. Although Ms. Cowens testified that without any doubt, the notice was mailed to Mr. Shrair and not to Mr. Polep, Cowens Dep. at 93-95, Mr. Shrair claims he first received it from Mr. Polep by facsimile. Shrair Dep. at 53-54. Mr. Shrair says he didn't receive the notice from Mr. Polep until July 15, 2004, although it is dated June 17, 2004. Shrair Dep. at 56. Mr. Shrair's advice to Mr. Polep was to discuss the notice with his insurance agent, although Mr. Shrair wasn't sure who the agent was. Shrair Dep. at 56-57. In any event, it is undisputed that as of July 15, 2004, both Mr. Shrair, as the owner, and Mr. Polep, as the insured, had seen the June 17, 2004 notice that the

{K0323082.1}                                8

Policy was in danger of lapsing and that a remittance in the amount of $6,548.55 was needed immediately.

Mr. Shrair knew that Mr. Polep, who at this time was 79 years old, had suffered a stroke and was confined to a wheelchair, was asking for his advice and counsel on what he should do with respect to the Policy. Mr. Shrair was the first person that Mr. Polep contacted about the fact that his policy was lapsing and a premium needed to be paid. Except for telling him to talk to his insurance agent, whose identity Mr. Shrair did not know, he gave Mr. Shrair no other advice or counsel on how he should proceed. Although he was the record owner of the Policy and Mr. Polep's attorney, and despite that he had actual knowledge that the Policy was about to lapse, Mr. Shrair failed to take any steps to see that the Policy remained in force. Fortunately, Mr. Polep did contact an insurance agent – James Aronson – the son of Hillard Aronson (Mr. Polep's original agent when the policy was purchased in 1985). Mr. Aronson contacted Reassure on the same day that Mr. Polep contacted him by calling the 1-800 number on the lapse notice and confirmed that a check in the amount of $6,548.55 was needed in order to keep the Policy in force. Aronson Dep. at 34-35; Ex. 2. Mr Aronson also confirmed that the payment would only keep the policy in force for for three months. *Id.* Mr. Aronson passed this information on to Mr. Polep and Mr. Polep did as Mr. Aronson instructed; he sent the required payment to Reassure by overnight mail. Aronson Dep. at 40-41; Ex. 3.

Within a week after Mr. Shrair became aware of the precarious state of the Policy, he and Mr. Polep both received additional information about how "badly underfunded" the Policy was at that time. Aronson Dep. at 42-43, 58-59; Ex. 4. On July 24, 2004, Mr. Aronson sent a letter to Mr. Shrair, with a copy to Mr. Polep, specifically informing both of them as to the status of the Policy. Aronson Dep. at 42-43, 58-59; Ex. 4. In the very first paragraph of his letter Mr. Aronson advised Mr. Shrair that "[I]n June 2004 all premiums and cash values were used up to pay for coverage charges over the past years. Reassure America requested by letter a minimum payment of $6,548.22 to cover a few months of coverage charges. This year's

monthly charge is $3,168. and **another premium payment will be needed in August.**"[4] *Id.- Ex. 4. (emphasis added).* Twice Mr. Aronson called Mr. Shrair; once just before he sent his letter, and again in August. The purpose of the August call was to follow up on the letter, since Mr. Aronson had not heard back from Mr. Shrair and the need for a premium payment was approaching. Aronson Dep. at 59. Mr. Shrair said that he had been speaking with Mr. Polep's son, Jeffrey Polep, but they hadn't yet made a decision on what to do. *Id.* at 58-59. Mr. Aronson asked if there was anything he could do to help or if any further explanation was needed on anything. *Id.* at 61. Mr. Shrair remembers speaking with Mr. Aronson sometime in the summer or fall of 2004, but he doesn't recall any discussion about the need to pay premiums on the Policy. Shrair Dep. at 69-71.

The foregoing summary establishes beyond question that both Mr. Shrair and Mr. Polep received a copy of the June 17th payment due notice and had actual knowledge of the fact that a premium payment was needed immediately to keep the policy in force because the Policy no longer had any cash value and that another premium payment would be needed within a month.

5.  **In Accordance With the Grace Period Provision of the Policy, Reassure Gave Written Notice to Mr. Shrair in October, 2004 that a Premium Was Needed to Pay the Monthly Expense Charges.**

As noted above, the only provision of the Policy that requires notice to be given with respect to a premium payment is the Grace Period paragraph, which provides: "Written notice of such premium [sufficient to cover the Monthly Expense Charge] will be mailed at least thirty days before coverage ends to the last known address of the Owner." Shrair Dep. – Ex. 3, p. 008. Barbara Cowens established in her deposition testimony that Reassure provided written notice in accordance with the Grace Period provision, both in June and October of

---

[4] Although it is certain that Mr. Shrair received this letter, as he forwarded copies to both Mr. Polep and J. Rockwell Allen in August, 2004, a copy of Mr. Aronson's letter was not in Mr. Shrair's files and was not produced by Mr. Shrair in response to a request for production of documents. Additionally, Mr. Shrair testified that he did not exchange any correspondence with Mr. Aronson. Shrair Dep. at 71. *But see,* Aronson Dep.-Ex. 8 and Allen Dep.-Ex. 3. Similarly, copies of the letters sent by Mr. Shrair to Mr. Polep in August, 2004, one dated August 5 and the other dated August 26, which were produced by both Mr. Aronson and Mr. Allen, were not in Mr. Shrair's files and were not produced.

2004, when each time the Policy had entered the grace period due to the fact that the Policy's monthly expense charges were not being paid. The notice provided for in the Grace Period provision is actually titled a "Payment Due Notice," Cowens Dep. – Ex. 27, and is referred to as a "lapse notice." *Id.* at 24.

Ms. Cowens testified that based upon her 27 years of experience with Reassure, her detailed knowledge of Reassure's systems and operations and her personal review of the company's records with respect to the Mortimer Polep policy, there was no question that the two lapse notices dated June 17, 2004 and October 18, 2004 were sent to Mr. Shrair at the address of record. As discussed above, it is undisputed that the June 17th notice was mailed by Reassure because it was in fact received. *Also see,* Cowens Dep. at 93-95; Ex. 26. Ms. Cowens further testified that according to Reassure's business records that she reviewed, a payment due notice dated October 18, 2004 was mailed by Reassure to "David Shrair and Anne Polep, Trustees at the address of record – 1380 Main Street, Springfield, MA 01103." Cowens Dep. at 100; Ex. 27. As with the June 17th notice, the October 18th notice was sent in a double window envelope with Mr. Shrair's address showing through the window in the center of the envelope. Cowens Dep. at 101. This notice was produced and mailed in accordance with Reassure's usual and customary procedures. Cowens Dep. at 98-101. In addition, Reassure has no record that the October 18th letter was returned to it by the U. S. mail service. Cowens Dep. – Ex. 30, p. 2.

It is a well-established principle that evidence of a properly addressed and stamped letter is prima facie evidence of its receipt. *Anderson v. Billerica*, 309 Mass. 516, 518, 36 N.E. 2d 393 (1941). With respect to a letter intended to give notice, such as a premium due notice, it is presumed that the letter was received in the ordinary course of the mail upon evidence of its mailing, *Avisais' Case*, 285 Mass. 56, 58, 188 N.E. 497 (1933), as the regular course of the mail is always presumed. *Holiver v. Department of Public Works*, 333 Mass. 18, 21, 127 N.E. 2d 790 (1955). "Every presumption is that a notice sent by mail will be delivered and received." *Petition of Liberty Mut. Ins. Co.*, 298 Mass. 75, 76, 9 N.E. 2d 718,

719 (1937). Moreover, where the letter is not returned to the sender, receipt or delivery is further presumed. *Smith v. Smith*, 42 B. R. 927, 931, 1984 Bankr. LEXIS 4904, **11 (D. Mass. 1984). However, the precise issue here is not whether the October 18th letter was received, but rather was it mailed. If it was, Reassure has complied with its contractual duty to mail the notice. Furthermore, as the following cases illustrate, Mr. Shrair's contention that he didn't receive the October 18th notice does not create an issue of fact on whether the notice was mailed.

The case of *Federal Kemper Life Ins. Co. v. Ellis*, 28 F. 3d 1033 (10th Cir. 1994) is directly on point on this issue. Federal Kemper Life commenced this declaratory judgment action to deal with a factual situation nearly identical to the present action. The Federal Kemper life insurance policy insuring Jerry Ellis, the late husband of the defendant Verlie Ellis, lapsed eight months prior to the insured's death. A quarterly premium due on the policy in April, 1990 was not paid and the policy lapsed 30 days later. Mrs. Ellis contended that she never got a contractually required notice that a premium was due, but Kemper established through proof of its standard operating procedures with respect to giving notice that the premium due notice was in fact mailed. Federal Kemper moved for summary judgment and Mrs. Ellis opposed it, contending that her non-receipt of the premium due notice created an issue of fact on whether Kemper ever sent it. *Id.* at 1039. The district court rejected this contention and entered summary judgment for Kemper. On appeal, the Tenth Circuit Court of Appeals affirmed the summary judgment applying Kansas law, stating as follows:

> Kemper had no duty to ensure defendant actually received the notice, but only to mail the notice to the defendant's address.... The burden of the failure of the post office to deliver falls upon the insured, not the insurer, in such circumstances. Simple denial of receipt does not create an issue for the jury as to whether the notice was mailed when Kemper has presented evidence of standard mailing procedures. The cases defendant cites in support of her argument all deal with presumption of receipt upon a showing of mailing. But we have agreed with the district court that the policy required mailing only.

*Id.* at 1039-1040.[5]

The same conclusion was reached in the case of *Yessick v. Midland Life Ins. Co.*, 178 F. Supp. 2d 1301 (N. D. Ga. 2001), which involved the same basic facts and the same basic issue. Plaintiff's husband died in an airplane crash four months after an $800,000.00 life insurance policy issued to him by Midland Life had lapsed. A semi-annual premium due in May, 1999 was not paid, but plaintiff claimed that a premium due notice that Midland was required to send was never received. Midland presented evidence of its routine, customary computerized procedures regarding mailing premium notices and maintained that the notice had in fact been sent. On this evidence, the court concluded that there was no genuine issue of material fact in dispute regarding whether the notice was sent to Mr. Yessick by Midland. Midland had fulfilled its contractual obligation to the deceased simply by sending the premium notice. "Mere denial of receipt on the part of Plaintiff does not raise a jury issue regarding whether the notices were mailed." *Id.* at 1305, citing *Federal Kemper v. Ellis, supra.* See also, *Bell v. Patrons Mut. Ins. Assn.*, 816 P. 2d 407 (Kan. App. 1991) (Under Kansas law, notice of cancellation of motor vehicle policy for nonpayment of premium did not have to be actually received by insured to effectuate valid cancellation of policy and proof of mailing would be sufficient proof that notice was provided; summary judgment for insurer affirmed.).

The absence of a *genuine* issue of material fact on the issue of Reassure's mailing of the payment due notice is shown by Mr. Shrair's inability to state with any certainty as to what mailings he did, or did not, receive from Reassure. Mr. Shrair testified at deposition with respect to his daily procedure on receiving and opening mail. All of his mail would be opened by his secretary and he would never see the envelope in which the mail was sent. Shrair Dep. at 44. Therefore, Mr. Shrair could not identify the source of any document in his file. *Id.* at 40-43, 83, 89-90. As Mr. Shrair stated, "I don't recall if [the annual policy statements] came directly from Reassure. They might have and they might not have." *Id.* at

---

[5] In a footnote, the Court of Appeals noted that the district court had confused the presumption of receipt when mailing is shown with a presumption that the mailing was made based on proof of custom of standard office procedure. *Id.* at 1040, n. 8.

43. And Mr. Shrair admitted that his mail filing procedures were not the greatest. In his words, he and his office secretary attempted to follow these procedures, but "we all know that there are problems" in this regard. *Id.* at 96-98.

The most glaring "problem" with respect to Mr. Shrair's mail filing system concerns the absence from his file of the James Aronson letter dated July 24, 2004. As stated above, *supra* at 9-10, n. 4, this letter was not in Mr. Shrair's file and was not produced in response to Reassure's request for production of documents.[6] Nor was there a copy in Mr. Shrair's file of his own letter to Mr. Polep in August, 2004 in which he enclosed a copy of Mr. Aronson's letter. Mr. Aronson and Mr. Allen both produced copies of Mr. Shrair's forwarding letter, but strangely, the copies produced bore different dates, with Aronson's unsigned copy dated August 26, 2004 and Allen's signed copy dated August 5, 2004. Aronson Dep. - Ex. 8; Allen Dep.-Ex. 3. The absence of these two key pieces of correspondence from Mr. Shrair's file has never been accounted for. But just as these key documents are missing from Mr. Shrair's file, so too is a copy of the October 18, 2004 lapse notice missing from his file. In light of the self-admitted deficiencies in Mr. Shrair's mail processing procedures and the glaring absence of two key letters that clearly existed from his file, one of which he himself wrote (apparently on two separate occasions), Mr. Shrair's bare assertion that he did not receive the October 18, 2004 notice is woefully insufficient to create a genuine issue of material fact on the question of whether Reassure sent the notice in the first place.

Reassure's proof that a payment due notice was mailed in October, 2004 also satisfies the statutory requirements of Mass. G. L. c. 175, § 110B.[7] This statute allows an insured to

---

[6] The July 24, 2004 letter from Mr. Aronson to Mr. Shrair was produced by Mr. Aronson at his deposition on December 16, 2005. Mr. Shrair's deposition preceded Mr. Aronson's deposition, and thus the letter was not available at the time of Mr. Shrair's deposition.

[7] It is questionable whether this statute is even applicable to Mr. Polep's flexible premium universal life policy. By its terms, the statute does not apply to life insurance policies on which "the premiums are payable monthly or at shorter intervals." As stated above, the amount and frequency of Planned Periodic Premium payments could be changed at any time, and Mr. Polep was certainly not paying premiums on any set schedule. Moreover, the actual premium charges to the Policy were being made on a monthly basis in the form of monthly expense charges, which

{K0323082.1}   14

pay an overdue premium on a lapsed life insurance policy within three months of the date of the lapse, unless the company can show that it has mailed, within a period of not less than 10 days nor more than 45 days prior to the date when the premium is due, a notice showing the amount of the premium due and the fact that the policy will lapse if the premium is not paid. Ms. Cowens detailed testimony under oath that the October 18, 2004 notice was mailed in accordance with Reassure's computerized operating procedures is prima facie evidence that this required statutory notice was duly given.

6. **Mr. Shrair and Mr. Polep Both Had Actual Knowledge That the Cash Value of the Policy Had Been Depleted and That Funds Were Needed to Pay the Monthly Expense Charges.**

Regardless of whether Mr. Shrair received the October 18, 2004 notice, the undisputed fact remains that both of them had *actual* knowledge of the fact that cash value was depleted and that an infusion of cash was desperately needed. They first came to have such actual knowledge when the June 17, 2004 lapse notice was received and discussed. Shrair Dep. at 53-57; Ex. 4E. The very first sentence of the notice advised them both that "Our records indicate that your policy has entered the grace period and is in danger of lapsing," and then went on to urge Mr. Shrair to remit a check promptly for $6,548.55 "in order to keep your valuable coverage in force." Despite this very clear language, Mr. Polep was apparently unsure as to what he should do, and thus he contacted Mr. Shrair. Mr. Shrair's only advice was to "discuss it with your insurance agent." Although Mr. Shrair didn't know who Mr. Polep's insurance agent was at the time, this was good advice because James Aronson was the right person for Mr. Polep to speak with about the Policy. Mr. Aronson's immediate call to Reassure and his follow-up call to Mr. Polep confirmed, just as the notice stated, that an immediate payment was needed. His advise saved the policy at that time.

The second time when Messrs. Shrair and Polep received actual notice of the potential lapse of the Policy was when Mr. Aronson sent his letter of July 24, 2004 to Mr. Shrair, with

---

is what Mr. Polep eventually failed to pay causing the Policy to lapse. Reassure reserves its rights on this point, and is merely assuming *arguendo* that the statute applies.

a copy to Mr. Polep. Mr. Aronson had already advised Mr. Polep by telephone that his July payment would only carry the Policy through August and that a further payment would be needed at that time. Aronson Dep. at 38. In his letter to Mr. Shrair, Mr. Aronson repeated this information, i.e., that by June, 2004 the cash value of the Policy had been depleted and that the July payment that Mr. Polep had made would carry the Policy for only a few months and that another premium payment would be needed in August. Mr. Aronson's letter clearly and accurately put both Mr. Shrair and Mr. Polep on notice that another premium would be needed within a month because the Policy had no cash value to support the payment of premiums.

The third time when Mr. Shrair again received notice of the need to make a premium payment was in August when Mr. Aronson made a follow-up phone call to Mr. Shrair and asked him if he had decided what to do with the Policy. Aronson Dep. at 59-60. This call obviously prompted Mr. Shrair to take another look at Mr. Aronson's July 24th letter- on August 5, and apparently again on August 26 when Mr. Shrair sent a copy of Mr. Aronson's letter to Mr. Polep.

The fourth time when actual notice was received was when J. Rockwell Allen, a licensed insurance agent and financial planner, was retained by the Polep family to assist and advise them with respect to the Policy and Mr. Polep's other investments. After an initial meeting in August, 2004, Mr. Allen met with Mr. Polep and his family on September 21, 2004 and at that time received a copy of the first page of Mr. Aronson's July 24th letter. Allen Dep. at 32-35; Ex. 3. Furthermore, Mr. Allen remembers discussing Mr. Aronson's letter with the Polep family at the September 21st meeting, and specifically remembered a discussion about the level of premium that would be needed to keep the policy in force. Allen Dep. at 35. But despite this discussion in late September and the actual knowledge that a premium was needed in August, Mr. Allen, the Polep family's duly retained insurance agent or broker, took no further action with respect to the Policy until late November, 2004, after the policy had already terminated. Allen Dep. at 51-52; Exs. 4 and 5.

The foregoing facts are established from the uncontradicted testimony and documents provided by Mr. Aronson and Mr. Allen, both third-party witnesses. Mr. Shrair's testimony and document production is glaringly deficient in comparison. For example, when he was asked whether he was aware in November, 2004, that the Policy was "significantly underfunded and may lapse," he responded: "No, I was not aware that it was underfunded," nor was he aware that the Policy was in danger of lapsing. Shrair Dep. at 88. When asked about his conversations with Mr. Aronson, he could only recall Mr. Aronson's first phone call in July, 2004, when Mr. Aronson supposedly said that "he really had no knowledge of the policy." Shrair Dep. at 90-91. Mr. Shrair claims to have a had a conversation with Mr. Allen about the June, 2004 notice, Shrair Dep. at 71-72, when it is clear that this conversation was actually with Mr. Aronson; as Mr. Allen was not contacted by the Polep family until August, 2004. When asked if he had exchanged any correspondence with Mr. Aronson, Mr. Shrair replied "I don't believe so." Shrair Dep. at 71. And as discussed above, Mr. Shrair's file contained none of the correspondence relating to the Aronson letter of July 24, 2004.

## 7.   Conclusion

While it is true that on a motion for summary judgment the credibility of witnesses should rarely be considered, when Plaintiffs' entire case hinges on their denial of receipt of notice, the Court must judge harshly inconsistencies in Plaintiffs' testimony and the absence of key documents from the correspondence file upon which Plaintiff relies when weighing whether any issue of fact exists that would allow a fact-finder to rule that notice was, in fact, not received. When Plaintiffs' own records are inadequate and raise grave doubts as to whether a correspondence was received, but was not maintained, it is appropriate to ask whether receipt can be established without the need for a trial. It is, without doubt, difficult for a defendant to prove that a notice or letter was in fact received. In this case, however, Reassure has overcome that burden. When Reassure merged with Royal Maccabees, it took over the administration for approximately 300,000 policies. As with all insurance companies, as well as all businesses, with mailings of this magnitude the process is highly computerized.

Through the testimony of Ms. Cowens and the documents produced, Reassure has established that the October 18, 2004 notice was mailed in accordance with the terms of Mr. Polep's policy. Mr. Shrair's testimony and the documents that he produced does not in any way rebut Reassure's proof, nor does it create a genuine issue of material fact. Moreover, the evidence produced by Mr. Aronson and Mr. Allen prove conclusively that both Mr. Shrair and Mr. Polep had actual notice that a premium payment was needed in the September-October time period or else the Policy would lapse. There is no genuine question that Plaintiffs' knew the policy was lapsing in September 2004. There is no genuine question that Reassure sent notice of the lapse. For the forgoing reasons, Reassure is entitled to summary judgment.

Respectfully submitted,

REASSURE AMERICA LIFE
INSURANCE COMPANY

By its attorneys,

_____
Edward S. Rooney, Jr.
BBO No. 426840
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
One International Place, 18th Floor
Boston, MA 02110
(617) 342-6800

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by over night mail, postage prepaid, this 10th day of April, 2006.

_____
Edward S. Rooney, Jr.